1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,                 No.  1:17-cr-00010-NONE

12                    Plaintiff,

13          v.                                  ORDER DENYING DEFENDANT'S
                                                MOTION FOR COMPASSIONATE
14    CURTIS ANDREW BALDWIN, et al.,            RELEASE

15                    Defendant.                (Doc. Nos. 93, 101)

16

17

18          Pending before the court is defendant Curtis Andrew Baldwin's motion for compassionate

19    release pursuant to 18 U.S.C. § 3582(c)(1)(A) as supplemented.  The motion and supplement are

20    largely based on defendant's medical condition and the alleged risks posed to him by the ongoing

21    coronavirus ("COVID-19") outbreak.  (Doc. Nos. 93 at 6; 101.)  For the reasons explained below,

22    defendant's motion will be denied.

23                                  **BACKGROUND**

24          On October 19, 2018, defendant pleaded guilty to one count of distribution of 50 grams or

25    more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1) as alleged in Count Three

26    of the indictment in this case.  (Doc. No. 74 at 2.)  Specifically, as part of the presentence

27    investigation it was determined that defendant Baldwin was responsible for supplying 439 grams

28    of actual methamphetamine to a confidential source and was subsequently arrested by federal

                                          1

authorities.  (Doc. No. 80 (Presentence Report) at 5.)  It was also determined that under the U.S. Sentencing Guidelines defendant Baldwin's adjusted offense level was 29 and his criminal history category was VI, resulting in an advisory sentencing guideline range calling for a sentence of 151 to 188 months imprisonment.[1]  (*Id.* at 19.)  The U.S. Probation Office recommended a low-end-guideline sentence of 151 months imprisonment.  (*Id.*)  At the sentencing hearing held on January 14, 2019, the sentencing judge departed downward from the guideline range and sentenced the defendant to the custody of the U.S. Bureau of Prisons (BOP) for a term of imprisonment of 128 months, with that term to run consecutively with a state sentence imposed against defendant in a different case, and with a 60 month term of supervised release to follow. (Doc. No. 85 at 2–3.)

Defendant is currently serving his federal sentence at the U.S. Bureau of Prisons' ("BOP") Lompoc Federal Correctional Institution in Lompoc, California ("FCI Lompoc").  (Doc. No. 93 at 1.)  On April 22, 2020, defendant appearing pro se filed the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (*Id.*)  Defendant, by and through his appointed counsel (*see* Doc. Nos. 94, 95), filed a supplemental opening brief in support of that motion on May 24, 2020.  (Doc. No. 101.)  On June 22, 2020, the government filed its opposition to the motion, and on June 28, 2020, defendant filed his reply thereto.  (Doc. Nos. 105, 108.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances.").  Those limited circumstances include compassionate release in extraordinary cases.  *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP.  18 U.S.C. § 3582(c)(1)(A)

---

[1]  In light of the amount of actual methamphetamine involved in defendant's offense of conviction he faced a ten–year minimum mandatory sentence on this charge.  (Doc. No. 80 at 1, 15.)

(2002).  Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).  In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)   extraordinary and compelling reasons warrant such a reduction; or
>
> (ii)  the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

---

[2]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response."  28 C.F.R. § 542.15(a).  If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed."  *Id.*  "Appeal to the General Counsel is the final administrative appeal."  *Id.*  When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights."  *See* 18 U.S.C. § 3582(c)(1)(A).

[3]  Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention.  The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP.  CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020).  However, the BOP's authority in this regard is limited to "the covered

1    The applicable policy statement with respect to compassionate release in the U.S.

2    Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

3    compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also*

4    *United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar.

5    31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary

6    and compelling reasons," even though that policy statement was issued before Congress passed

7    the FSA and authorized defendants to file compassionate release motions).  However, a large and

8    growing number of district courts across the country have concluded that because the Sentencing

9    Commission has not amended the Guidelines since the enactment of the FSA, courts are not

10   limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether

11   extraordinary and compelling circumstances are presented justifying a reduction of sentence

12   under 18 U.S.C. § 3582(c).  *See, e.g.*, *United States v. Parker*, __ F. Supp.3d __, 2020 WL

13   2572525, at *8–9 (C.D. Cal. May 21, 2020) (collecting cases); *United States v. Rodriguez*, 424 F.

14   Supp. 3d 674, 681 (N.D. Cal. 2019).

15   In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

16   defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

17   _____

18   emergency period."  *Id.*  The BOP's authority expires "30 days after the date on which the
     national emergency declaration terminates."  *Id.* § 12003(a)(2).  After the CARES Act was

19   enacted, the Attorney General issued a memo instructing the BOP to "immediately review all
     inmates who have COVID-19 risk factors" beginning with those who are housed at facilities

20   where "COVID-19 is materially affecting operations."  Office of Att'y Gen., *Increasing Use of
     Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has

21   acted on the Attorney General's guidance, including one case in which a sentenced prisoner was

22   released to home confinement after serving less than half his sentence from a facility that reported
     no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort*

23   *Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.
     com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the

24   prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release

25   prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid
     COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-

26   manafort-released-from-prison-amid-covid-19-fears.

27   [4]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18
     U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person

28   or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1  *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

2  has not specifically addressed the question of which party bears the burden in the context of a

3  motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts

4  that have done so have agreed that the burden remains with the defendant.  *See, e.g.*, *United*

5  *States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020);

6  *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7,

7  2020).

8  **ANALYSIS**

9        As district courts have summarized, in analyzing whether a defendant is entitled to

10  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

11  defendant has satisfied three requirements:

12      First, as a threshold matter, the statute requires defendants to exhaust
    administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  Second, a

13  district court may grant compassionate release only if "extraordinary
    and compelling reasons warrant such a reduction" and "that such

14  reduction is consistent with applicable policy statements issued by
    the Sentencing Commission.  *Id.*  Third, the district court must also

15  consider "the factors set forth in Section 3553(a) to the extent that
    they are applicable."  *Id.*

16

17  *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-

18  LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 2020 WL 2572525, at *4;

19  *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

20  2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

21  "consistent with" the sentencing factors set forth in §3553(a)).

22  **A.      Administrative Exhaustion**

23        According to the government, defendant submitted an administrative request to the

24  warden at FCI Lompoc around April 1, 2020 and it was denied seven days later on April 8, 2020.

25  (Doc. Nos. 105 at 8; 105-1 at 10; 108 at 2.)  Defendant then filed his original motion for

26  compassionate release in this court on April 22, 2020.  (Doc. No. 93.)  Defendant argues that the

27  exhaustion requirement's 30-day window applies even where a warden responds within 30 days.

28  (Doc. No. 108 at 2.)  However, that interpretation is flawed, as noted above.  *See supra* note 2.

5

1   Nonetheless, the court need not definitively resolve the issue of whether defendant has properly

2   exhausted his administrative remedies.  As discussed below, the pending motion for

3   compassionate release fails to establish extraordinary and compelling reasons warranting

4   defendant Baldwin's release.

5   **B.      Extraordinary and Compelling Reasons**

6          "Extraordinary and compelling reasons" warranting compassionate release may exist

7   based on a defendant's medical conditions, age and other related factors, family circumstances, or

8   "other reasons."  U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other

9   reasons" was included in the policy statement at a time when only BOP could bring a

10  compassionate release motion, courts have agreed that it may be relied upon by defendants

11  bringing their own motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-

12  JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

13         Thus, the medical condition of a defendant may warrant compassionate release where he

14  or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

15  trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a

16  specific time period) is not required."  U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive

17  examples of terminal illnesses that may warrant a compassionate release "include metastatic

18  solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced

19  dementia."  *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental

20  condition may warrant compassionate release, including when:

21         The defendant is

22         (I)   suffering from a serious physical or medical condition,

23         (II)  suffering from a serious functional or cognitive impairment, or

24         (III) experiencing deteriorating physical or mental health because of
              the aging process,

25         that substantially diminishes the ability of the defendant to provide
           self-care within the environment of a correctional facility and from

26         which he or she is not expected to recover.

27

28  *Id.* at cmt. n.1 (A)(ii).  Where a defendant has moderate medical issues that otherwise might not

                                        6

1    be sufficient to warrant compassionate release under ordinary circumstances, some courts have

2    concluded that the risks posed by COVID-19 tips the scale in favor of release in particular

3    situations.  *See, e.g.*, *United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at

4    *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19 pandemic—an undeniably

5    extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and

6    rehabilitation would not present extraordinary and compelling reasons to reduce his sentence.

7    But taken together, they warrant reducing his sentence.").

8         Compassionate release may also be warranted based on a defendant's age and other

9    related factors.  In these situations, "extraordinary and compelling reasons" exist where a

10   "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or

11   mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of

12   his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).[5]  In

13   determining a defendant's projected release date, courts may take into account any "good time

14   credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18

15   U.S.C. § 3624(b)(1).  *See, e.g.*, *United States v. Burrill*, No. 17-cr-00491-RS, 2020 WL 1846788,

16   at *1 n.1 (N.D. Cal. Apr. 10, 2020).

17        Here, defendant Baldwin argues that extraordinary and compelling reasons warranting his

18   compassionate release exist due to his age, health conditions, and the risk posed to him by

19   COVID-19.  To establish extraordinary and compelling reasons in support of his compassionate

20   release motion, defendant must show that he is "suffering from a serious physical . . . condition . .

21   . that substantially diminishes [his] ability . . . to provide self-care" in FCI Lompoc and "from

22   which he . . . is not expected to recover."  *See* U.S.S.G. § 1B1.13, cmt.n.1 (A)(ii).  Defendant is

23   58 years old and claims he is obese, has tested positive for tuberculosis, has both high cholesterol

24   and high blood pressure, and is a diabetic.  (Doc. No. 101 at 17–18.)  The government concedes

25   that defendant may potentially demonstrate extraordinary and compelling reasons based on his

26   diabetes and, potentially, his prior diagnosis of tuberculosis, which the government has assumed

27
     ─────────────────────
28   [5]  However, because defendant Baldwin is only 58 years old (Doc. No. 80 at 3), his age and age-
     related factors do not play a role in consideration of his pending motion.

1    *arguendo* is a "chronic lung disease."  (Doc. No. 105 at 15–16.)

2           Defendant's BOP medical records corroborate his Type 2 diabetes diagnosis.  (Doc. No.

3    124 at 8 (sealed).)  However, the court is unable to identify any evidence before it supporting

4    defendant's tuberculosis diagnosis, although the government does not dispute that defendant did

5    test positive for tuberculosis at some point.  (*See passim* Doc. No. 80 (Presentence Report) at 14

6    (reflecting defendant's report that he suffers from hypertension, sleep apnea, prediabetes, and

7    used a continuous positive airway pressure machine while sleeping, but noting that defendant did

8    not provide any documentation of these conditions so that the probation officer could not verify

9    them).  Aside from his Type 2 diabetes and tuberculosis, defendant suffers from hypertension

10   which was noted at the time of his sentencing and is confirmed by his BOP medical records.  (*Id.*;

11   Doc. No. 124 at 9 (sealed).)  Finally, defendant both qualified as medically obese at the time of

12   his sentencing, and is still medically obese as recently as May 22, 2020.  (Doc. Nos. 80

13   (Presentence Report) at 3 (listing defendant at 6'2" and 260 pounds, placing his BMI at

14   approximately 33.4); 124 at 16 (sealed: BMI now higher).)

15          Therefore, according to the U.S. Centers for Disease Control and Prevention ("CDC"),

16   defendant is at higher risk for becoming severely ill were he to contract COVID-19 because of his

17   Type 2 diabetes and his obesity.  *See Coronavirus Disease 2019 (COVID-19): People Who Are at*

18   *Increased Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,

19   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-

20   risk.html (last visited Oct. 7, 2020).  Defendant "might be at an increased risk for severe illness

21   from COVID-19" because of his hypertension.  *Id.* (stating those who suffer from pulmonary

22   hypertension are in fact at risk, as opposed to hypertension generally which "may" place an

23   individual at risk).  Additionally, defendant may be at higher risk of severe illness from the virus

24   due to his age.  *Id.*  On the whole, it appears clear that defendant is at higher risk of a severe

25   illness were he to contract COVID-19.

26          Nonetheless, the court notes that defendant tested positive for COVID-19 on May 6, 2020.

27   (Doc. Nos. 105 at 9; 108 at 3.)  And defendant does not contest the government's assertion that he

28   "has since recovered."  (*See id.*)  Indeed, defendant's BOP medical records state that he was

8

1    asymptomatic and denied suffering from any of COVID-19's major symptoms.  (Doc. No. 124 at

2    19 (sealed).)  For example, defendant denied having a cough, shortness of breath, muscle pain,

3    fatigue, headaches, chills, sore throat, or a new loss in taste or smell.  (*Id.*)  After the passage of

4    time, defendant was deemed to have met the "criteria for the release from isolation" at his place

5    of imprisonment  (*Id.*)  Nonetheless, defendant argues that the possibility of reinfection from

6    COVID-19 weighs in favor of his compassionate release.  (Doc. No. 108 at 3.)  In this regard,

7    many courts have "err[ed] on the side of caution to avoid potentially lethal consequences"

8    because "the science is unclear on whether reinfection is possible."  *United States v. Yellin*, No.

9    3:15-cr-3181-BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020) (finding extraordinary

10   and compelling reasons exist where a COVID-positive inmate at FCI Terminal Island, who did

11   not develop severe symptoms, suffered from a combination of medical conditions that placed him

12   at risk of serious complications from COVID); *see also United States v. Hanson*, No. 6:13-cr-

13   00378-AA-1, 2020 WL 3605845, at *4 (D. Or. July 2, 2020) ("[T]here is no current scientific

14   evidence to indicate that a 'recovered' COVID-19 patient is immune from reinfection, as several

15   courts have recently acknowledged. . . . [T]he Court remains concerned about FCI Terminal

16   Island's ability to provide adequate care in light of defendant's complex medical needs.  The

17   Court is not convinced that FCI Terminal Island has been successfully mitigating the risk of

18   reinfection, given the high numbers of infected inmates and Defendant's own contraction of the

19   virus.").  Other courts have taken the position that uncertainty surrounding the danger of

20   reinfection "cuts against compassionate release," in part because it is the defendant's burden to

21   establish that "extraordinary and compelling reasons" justifying compassionate release exist.  *See*

22   *United States v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29,

23   2020).

24        Out of an abundance of caution, the court concludes that because of his Type 2 diabetes,

25   obesity, and hypertension, combined with the potential risk of reinfection from COVID-19,

26   defendant is "suffering from a serious physical . . . condition . . . from which he . . . is not

27   expected to recover."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Even so, the question then

28   remains whether defendant Baldwin has demonstrated that his medical conditions "substantially

9

1   diminish[] [his] ability . . . to provide self-care" in FCI Lompoc. *See id.*

2          Based on the current record, the answer to that question is no—defendant has not shown

3   he is unable to exercise self-care.  In fact, defendant does not argue that he is unable, or is in any

4   way hindered, from taking care of his obesity, diabetes, and hypertension while imprisoned—

5   aside from his conclusory statement that he is "'powerless to escape the infection' if it comes

6   again."  (Doc. No. 108 at 3.)  It is true that FCI Lompoc suffered from a significant COVID-19

7   outbreak, with it being reported by the BOP 746 inmates and 16 staff who tested positive but

8   recovered, while two inmates died at the hands of the virus.  *See COVID-19*, FEDERAL BUREAU

9   OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Oct. 7, 2020).[6]  At the moment,

10  however, it is currently reported that there are currently zero inmates and three staff who have

11  active cases of COVID-19.[7]  Because it appears that current active cases among prisoners at FCI

12  Lompoc have been reduced to zero, adding COVID-19 to the equation in this case does not tip the

13  scales in favor of defendant's compassionate release.  (*See also* Doc. No. 105-1, Ex. 5, at 12–42

14  (documenting steps FCI Lompoc has taken to reduce the prevalence of the virus).)  Even

15  defendant acknowledges that the possibility of contracting the virus again is only a possibility—

16  not a foregone conclusion.  (*See* Doc. No. 108 at 3 (arguing defendant "*could* become infected

17  again if he remains" in FCI Lompoc).)  Moreover, despite already contracting the virus, defendant

18  appears to be enjoying adequate physical health.  (*See* Doc. No. 124 at 15–16 (sealed: BOP

19  medical records dated May 22, 2020, roughly three weeks after defendant contracted COVID-19,

20  stating defendant was not in pain and appeared alert and orientated).)  It appears that the BOP is

21  providing defendant with regular and proper care for his Type 2 diabetes, hypertension, and his

22  sleep apnea.  (*See generally* Doc. No. 124 (sealed).)  While there is still some unknown risk to

23  defendant due to the possibility that he could be reinfected with COVID-19, that speculative

24  possibility provides no basis upon which the court could conclude that defendant has shown he is

---

25  [6]  FCI Lompoc has a population of 971 inmates.  *FCI Lompoc*, FEDERAL BUREAU OF PRISONS,
26  https://www.bop.gov/locations/institutions/lof/ (last visited Oct. 7, 2020).

27  [7]  While the undersigned does not necessarily accept these reported numbers at face value in light
    of current CDC guidelines with respect to both testing and the manner of counting "active cases,"
28  there is also no evidence before the court challenging those reported numbers in this case.

10

1    "substantially diminishe[d]" in his ability to "provide self-care" at FCI Lompoc. *See* U.S.S.G. §

2    1B1.13, cmt. n.1 (A)(ii). Thus, defendant Baldwin has failed to carry his burden in this regard.

3    *See Greenhut*, 2020 WL 509385, at \*1 ("The defendant bears the initial burden to put forward

4    evidence that establishes an entitlement to a sentence reduction.").

5         Therefore, in this case, the court does not find extraordinary and compelling reasons

6    justifying compassionate release pursuant to § 3582(c)(1)(A).

7    **C.     Consistency With the § 3553(a) Factors**

8         Because the pending motion and supplemental opening brief fail to establish extraordinary

9    and compelling reasons justifying compassionate release in this case, the court need not address

10   whether any reduction in defendant's sentence would be consistent with consideration of the

11   sentencing factors set forth at 18 U.S.C. § 3553(a).[8] Nonetheless, the court notes that defendant's

12   motion would be denied on this basis as well.

13        Defendant was involved in selling almost one pound of actual methamphetamine to a

14   confidential source, and the money from that transaction was recovered from defendant

15   Baldwin's person. (Doc. No. 80 (Presentence Report) at 19.) In addition to that conduct,

16   defendant's lengthy criminal history dating back 20 years ago—ranging from possession of

17   controlled substances, forgery, and evading police officers on multiple occasions—resulted in a

18   determination that his criminal history category was VI, the highest level under the advisory

19   Sentencing Guidelines. (*Id.* at 7–12, 19.) The U.S. Probation Office recommended a low-end of

20   the guidelines sentence of 151 months in prison. (*Id.*) Still, the court departed downward and

21

22   [8] Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court
     shall consider: the nature and circumstances of the offense and the history and characteristics of
23   the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote
     respect for the law, provide just punishment for the offense, afford adequate deterrence, protect
24   the public from further crimes of the defendant and provide the defendant with needed
     educational or vocational training, medical care, or other correctional treatment in the most
25   effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range
     established for the applicable category of offense committed by the applicable category of
26   defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing
     Commission; the need to avoid unwarranted sentence disparities among defendants with similar
27   records who have been found guilty of similar conduct; and the need to provide restitution to any
     victims of the offense.
28

1    sentenced defendant to a below-guideline sentence of 128 months.  (Doc. No. 85 at 2.)   The

2    undersigned will not second guess the judgment of the sentencing judge.

3          Defendant has served only approximately 17 months of his 128-month sentence.  (*See*

4    Doc. No. 105-1, Ex. 2, at 6.)  A 17-month sentence, a nearly 110-month reduction in the sentence

5    imposed, would not adequately reflect the seriousness of defendant's offense of conviction,

6    promote respect for the law, provide just punishment, or afford adequate deterrence to criminal

7    conduct.  *See* § 3553(a); *see also United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL

8    2773477, at *2 (D. Nev. May 28, 2020); *United States v. Shayota*, No. 1:15-cr-00264-LHK-1,

9    2020 WL 2733993, at *5–6 (N.D. Cal. May 26, 2020) ("The length of the sentence remaining is

10   an additional factor to consider in any compassionate release analysis, with a longer remaining

11   sentence weighing against granting any such motion." (citation omitted)).

12                                  **CONCLUSION**

13          For the reasons explained above, defendant's motion for compassionate release (Doc.

14   Nos. 93, 101) is denied.

15   IT IS SO ORDERED.

16       Dated:   **October 9, 2020**                  _____

17                                       UNITED STATES DISTRICT JUDGE